# EXHIBIT 3

# LICENSE AGREEMENT

This License Agreement (this "Agreement") is entered into effective as of December 28, 2012 (the "Effective Date") between One Pet Planet, LLC, an Oregon limited liability company ("Licensee"), and Sleash LLC, a Colorado limited liability company ("Licensor"). Each of Licensee and Licensor are referred to in this Agreement as a "Party" and are collectively, the "Parties."

1. **Definitions.**

   1.1. "EBITDA" means earnings before interest, taxes, depreciation and amortization, on the income statement of the Licensee Business prepared by Licensee.

   1.2. "Improvements" shall mean all improvements to the Patent Rights and Know-How, whether made before or after the Effective Date.

   1.3. "Intellectual Property Rights" means all intellectual property rights, including patent rights, copyrights, moral rights, trademark rights, trade name rights, service mark rights, trade dress rights, trade secret rights, proprietary rights, privacy rights, and publicity rights, whether or not those rights have been filed or registered under any statute or are protected or protectable under applicable law.

   1.4. "Know-How" means information that may: (a) be necessary or useful in Licensee's practice of the Patent Rights; and/or (b) relate to or be useful in the development, manufacture, use, sale or support of the Licensed Products. "Know-How" does not include any information contained in the Patent Rights.

   1.5. "Licensee Business" means Licensee's business of manufacturing, marketing, distributing and selling Licensed Products.

   1.6. "Licensed Product" means any pet product or device, or any product intended for use with or relating to pets, that incorporates any of the Licensed Technology, which Licensee may market and sell under one or more brand names, including the Licensed Marks.

   1.7. "Licensed Technology" means both the Patent Rights and the Know-How, and all Intellectual Property Rights related thereto. The "Licensed Technology" shall expressly include all Improvements.

   1.8. "Licensed Marks" means all of Licensor's trademarks, service marks, logos, trade dress, and other branding elements that Licensor uses or has used to sell Licensed Products, including those U.S. trademark and copyright registrations listed on Exhibit A to this Agreement.

   1.9. "Loss" or "Losses" means (a) all reasonable attorney fees paid or payable by a Licensee Indemnitee or Licensor Indemnitee in defense of any claim subject to indemnification under Section 16, whether prior to, at trial or any other proceeding and in any appeal or other post judgment proceeding; and (b) all sums paid or payable to any other person, including all direct losses and all damages (including property damage and all incidental, consequential, punitive and exemplary damages), injuries (including personal injury, sickness and death), interest, costs, fines, taxes, premiums, assessments, penalties, expenses, attorney fees (whether incurred prior to, at trial or any other proceeding and in any appeal or other post judgment proceedings) and other liabilities of any kind or nature.

   1.10. "Net Sales" means the total gross sales price actually received by Licensee from the sale of Licensed Products, less all of the following items: (a) sales, use and excise taxes; (b) tariffs;

(c) export license fees and duties; (d) Licensed Product returns; (e) and rebates, credits, early payment and other usual and customary trade discounts.

**1.11.** "Patent Rights" means the patents and patent applications listed on Exhibit B to this Agreement and all continuations, continuations-in-part, improvement patents, divisionals, reissues, extensions, substitute applications, reexaminations and foreign counterparts of those patents and patent applications.

**1.12.** "Term" means the period of time during which this Agreement is in effect, consisting of the Initial Term (as defined in Section 10.1) plus all Renewal Terms (as defined in Section 10.2), if any, unless this Agreement is earlier terminated as described in Section 10.

**2. Licenses.**

**2.1.** Licensed Technology. Licensor hereby grants to Licensee an exclusive, sublicensable, irrevocable, worldwide license under the Licensed Technology to make, have made, manufacture, have manufactured, use, have used, offer to sell, sell, have sold, import, export, have imported, have exported, distribute and have distributed any Licensed Products during the Term. Licensee may grant sublicenses under the foregoing license to one or more persons in its sole discretion. Such sublicensing will not relieve Licensee of any of its duties, obligations or promises under this Agreement. The license hereunder expressly conveys no ownership interest in the Licensed Technology, which shall at all times under this Agreement be retained by Licensor.

**2.2.** Licensed Marks. Licensor hereby grants to Licensee an exclusive, sublicensable, irrevocable, worldwide license to use the Licensed Marks on or in connection with the manufacture, marketing, promotion, sale and distribution of Licensed Products during the Term. Licensee may grant sublicenses under the foregoing license to one or more persons in its sole discretion. Such sublicensing will not relieve Licensee of any of its duties, obligations or promises under this Agreement. Specifically, Licensee agrees to maintain commercially reasonable quality standards as shall be prescribed by Licensor in writing or as otherwise reasonable under the circumstances in the conduct of the business operations with which the Licensed Marks are used. Expressly under this license, Licensee shall use the Licensed Marks only in conjunction with Licensed Products that are offered for sale or sold by Licensee in accordance with the terms of this Agreement. The license hereunder expressly conveys no ownership interest in the Licensed Marks, which shall at all times under this Agreement be retained by Licensor.

**3. Exclusivity.** Licensor will not license the Licensed Technology or the Licensed Marks to any other person during the Term for any purpose; however, Licensor is expressly permitted to take such actions in connection with other products that use the Licensed Technology for use in the sports and recreation industry; provided that such products are not competitive with the Licensed Products. Licensor will not, without Licensee's prior written consent, use the Licensed Technology or the Licensed Marks during the Term to undertake, directly or indirectly, any of the actions described in Section 2, above, including the manufacturing and selling of Licensed Products; however, Licensor is expressly permitted to take such actions in connection with other products that use the Licensed Technology for use in the sports and recreation industry; provided that such products are not competitive with the Licensed Products.

**4. New Product Development.**

**4.1.** Licensee will have the unlimited right to develop, market and sell new products even that compete with the Licensed Products, and only those new products that use the Licensed Technology shall be included in the definition of Licensed Products and subject to the Earned Royalties provided for under this Agreement. Licensee expressly agrees that any product, whether now known or later developed, that

is designed or configured to work based on the Licensed Technology shall be deemed a Licensed Product for purposes of this Agreement.

4.2. Any Improvements invented or created by either Party based on or implementing or utilizing, in whole or in part, the Licensed Technology shall be owned by Licensor and subject to this Agreement. Licensee agrees to cooperate in the sharing of information and execution of any documents necessary to give full legal effect to the provisions of this Section 4.2. Licensor agrees to promptly notify Licensee in writing regarding the invention, creation, or development of any Improvements and to cooperate in good faith with Licensee in incorporating such Improvement into the Licensed Products, should Licensee so elect. Even if Licensee elects not to incorporate any such Improvement into the Licensed Products under this Agreement, Licensor may not use or grant a license to such Improvement without the prior written consent of Licensee.

4.3. Notwithstanding Section 3 above, Licensor will have the right to develop new products that do not use the Licensed Technology and/or that do not compete with the Licensed Products. Licensor agrees to in good faith explore with Licensee such new products becoming a Licensed Product under this Agreement or on such other terms as mutually agreed upon in writing by the Parties. If such new products relate to the pet industry, prior to Licensor's manufacture, marketing, sale, or third-party licensing of such new products, Licensor exclusively grants to Licensee the right of first refusal to accept an exclusive license (subject to terms substantially similar to this Agreement) to any inventions or products created or developed by Licensor for the pet industry after the Effective Date. Pursuant to this right of first refusal, Licensor will promptly notify Licensee in writing of each new invention or product, and Licensee will have 30 days in which to notify Licensor that it wishes to accept an exclusive license to use such invention or product, at which time the Parties will appropriately amend this Agreement or execute a new license agreement on substantially similar terms. If Licensee fails to respond within such 30 day period, or affirmatively rejects its option in writing, only upon prior written consent of Licensee, may Licensor use or grant a license in such new invention or product.

## 5. Licensor's Rights and Obligations.

5.1. <u>Licensor's Product Inventory</u>. Within 60 days after the Effective Date, Licensee will purchase Licensor's existing inventory of Licensed Products as of December 1, 2012 as set forth on <u>Exhibit C</u>. Licensee will purchase such products at Licensor's cost, provided that in no event shall the total cost payable by Licensee for such products be greater than $30,000. Licensor covenants and agrees that it shall not acquire any additional inventory of Licensed Products between the date hereof and 60 days after the Effective Date. For all other Licensed Products as of the Effective Date that are not set forth on Exhibit C, Licensee, may, at its sole option and discretion, during the Term of this Agreement purchase from Licensor, some, all or none of such items at Licensor's cost.

5.2. <u>Customer Lists</u>. Within 5 days after the Effective Date, Licensor will deliver to Licensee a list of Licensor's customers as of the Effective Date, along with all relevant contact information for such customers. Licensor will cooperate in good faith with Licensee's use of such customer list, and with Licensee contacting such customers.

5.3. <u>Purchase of Licensed Products</u>. Notwithstanding Section 3, Licensor will have the right to purchase Licensed Products from Licensee at Licensee's cost, and resell or distribute such purchased Licensed Products at local pet fairs in the State of Colorado, or through HSN (including its online store), but not at retail establishments. With respect to all sales under this Section 5.3, Licensor will consult with Licensee in good faith in advance to the extent reasonably possible.

5.4. <u>Input on Materials</u>. The Parties will in good faith and within a reasonable time jointly approve the materials to be used in manufacturing the Licensed Products.

**5.5.** <u>Trademark Usage</u>. Licensee will permit duly authorized representatives of Licensor to inspect Licensed Products or the premises of Licensee using the Licensed Marks at a reasonable, agreed upon time or place, for the purpose of ascertaining or determining compliance with Section 2.2 hereof. Such inspections will be at Licensor's sole expense, and may not occur more than once per calendar year.

**6. Sales Representation.**

**6.1.** <u>Retail Advantage</u>. Licensor will instruct its current sales representative, Retail Advantage, to deliver to Licensee, within 30 days after the Effective Date, a list of accounts and retailers to which Retail Advantage actively sells Licensed Products as of the Effective Date. Provided that Retail Advantage provides such list within such 30 day period, and provided that Licensee can reach an agreement with Retail Advantage on the terms of such distribution or representation agreeable to Licensee, in its sole discretion, then Licensee will continue to use Retail Advantage as a sales agent for such Canadian accounts and retailers where Licensee did not have a prior existing contact or relationship, directly or indirectly through Licensee's employees, agents or otherwise.

**6.2.** <u>Other</u>. Except as specifically provided in Section 6.1, Licensee will have the right to utilize and contract with any sales representatives or distributors that Licensee may choose in its sole discretion.

**7. Patent Maintenance and Registration.** Licensor in its sole discretion will prosecute and maintain all patents and patent applications included in the Patent Rights and will keep Licensee advised, in a reasonable and timely manner, of the status of such prosecution and maintenance of the Patent Rights. The Parties will confer regarding strategy for filing, prosecution, and maintenance of relevant international patent applications pertaining to the Licensed Technology. Licensor and Licensor's patent attorney will consult with Licensee on, and notify Licensee in writing with respect to, all patent matters in advance of filing, responding or taking other actions concerning material patent matters, and Licensor will implement all reasonable requests made by Licensee with regard to material aspects of the preparation, filing, prosecution and/or maintenance of the patent applications and patents included within the Patent Rights. If Licensor fails to prosecute or maintain all patents and patent applications included in the Patent Rights or intends to allow one or more patents and patent applications included in the Patent Rights to lapse or otherwise expire, Licensor will provide Licensee with prior written notice of such intention. At such time, Licensee will be entitled to assume the prosecution and maintenance of such patents and patent applications at Licensor's expense, and Licensee may, at its sole election, offset such costs and expenses incurred against Earned Royalties or any other amounts otherwise payable to Licensor.

**8. Royalties; Payments.**

**8.1.** <u>Earned Royalties</u>. As full and complete consideration for the rights granted to Licensee and the obligations incurred by Licensor under this Agreement, Licensee will pay Licensor a royalty equal a certain percentage of the Net Sales received by Licensee during the Term from the sale of the Licensed Products (the "<u>Earned Royalty</u>"), as follows:

(a)  2.5% of Net Sales during the period (if any) when the cumulative Net Sales received by Licensee during the Term, from the sale of the Licensed Products, is between $0 and $250,000;

(b)  5.0% of Net Sales during the period (if any) when the cumulative Net Sales received by Licensee during the Term, from the sale of the Licensed Products, is between $250,000 and $500,000;

(c)   7.5% of Net Sales during the period (if any) when the cumulative Net Sales received by Licensee during the Term, from the sale of the Licensed Products, is between $500,001 and $1,000,000; and

(d)   10.0% of Net Sales during the period (if any) when the cumulative Net Sales received by Licensee during the Term from the sale of the Licensed Products exceeds $1,000,000.

**8.2.** Calculation and Payment of Earned Royalties. Earned Royalty will be calculated solely on Net Sales actually received by Licensee, and will not be based on the number of units of Licensed Products sold. Licensee will establish the sales price of all Licensed Products in its sole discretion. Licensee will pay Licensor the Earned Royalties described in Section 8.1 on a monthly basis, within 30 days following the end of each calendar month, based on Net Sales actually received by Licensee in such calendar month (if any) arising out of sales of Licensed Products.

**8.3.** Reporting. Together with its payment of Earned Royalties as described above, Licensee will provide Licensor with a monthly report of the Net Sales received from sales of the Licensed Products and the calculation of Earned Royalties based on such Net Sales.

**9.    Prosecution of Infringement.** Each Party will promptly notify the other if it knows or has reason to believe that any of the Patent Rights is being infringed directly or contributorily by any other person, as well as any facts that may affect the validity, scope or enforceability of the Patent Rights (the "Infringement Notice"). Licensor will, with Licensee's reasonable cooperation, terminate that infringement without litigation if possible. If within 120 days after the date of the Infringement Notice, attempts to abate such infringement are unsuccessful, then Licensor may bring an action at its own expense. If Licensor fails to bring an action within 180 days after the date the Infringement Notice, Licensee may bring an action, in which case Licensor will cooperate with Licensee as reasonably requested and such action will be at Licensor's expense. The Party initiating and maintaining the action will keep the other Party reasonably apprised of the status and progress of that litigation. Licensee will add Licensor as a party-plaintiff to such proceedings if requested by Licensor to do so or if required by law to do so to properly assert a claim (in which case Licensor will bear all of its own expenses in connection therewith). To the extent Licensee incurs costs or expenses associated with any such actions that are at Licensor's expense, Licensee is permitted and may, at its sole election, offset such costs and expenses incurred against Earned Royalties or any other amounts otherwise payable to Licensor. Any recovery from such an infringement suit shall be attributed first to the cost of such suit, to be reimbursed to the Party that incurred the expense directly or indirectly, and the remainder shall be apportioned to Licensor and Licensee according to actual damages, but in no event shall Licensor be apportioned less than ten percent (10%) of the remainder.

**10.   Term and Termination.**

**10.1.** Initial Term. This Agreement will take effect on the Effective Date, and, unless earlier terminated as set forth below, will expire on the third anniversary of the Effective Date (the "Initial Term").

**10.2.** Renewal Terms. This Agreement will automatically extend for an additional two-year period, unless either Party gives the other Party written notice of non-renewal at least 90 days prior to the expiration of the Initial Term. Thereafter, this Agreement will automatically extend annually for an additional one-year period, unless either Party gives the other Party written notice of non-renewal at least 90 days prior to the annual anniversary of the Effective Date, after each such extension leaving a two-year then-remaining term, and for every anniversary thereafter. Any period during which this Agreement is in force, beyond the Initial Term, is referred to as a "Renewal Term."

**10.3.** <u>Termination</u>.

(a)  After the end of the Initial Term, either Party may terminate this Agreement for convenience at any time by giving the other Party written notice at least 120 days prior to the effective date of termination.

(b)  Either Party may terminate this Agreement, effective immediately, in the event the other Party materially breaches any of the covenants, terms or conditions in this Agreement, and fails to cure that breach within 45 days after written notice of such breach.

(c)  To the extent permitted by law, either Party may terminate this Agreement immediately by written notice, if the other Party: (a) becomes insolvent; (b) files a voluntary petition in bankruptcy; (c) makes an assignment for the benefit of creditors or otherwise enters into any scheme or composition with its creditors; (d) is adjudicated as bankrupt; (e) suffers a receiver to be appointed for the operation of its business; or (f) makes a liquidation of substantially all of its assets.

(d)  Whether during or after the Initial Term or any Renewal Term, Licensor may terminate this Agreement, effective immediately, in the event that war, fire, earthquake, or other natural catastrophe, the death or incapacity of a principal of Licensee, or any act of God, but excluding labor disputes involving all or any part of the work force of Licensee or its agent or affiliate, substantially prevents Licensee from performing under this Agreement such that for a period of six (6) months sales of Licensed Products in the aggregate have reduced 90% or more from sales of Licensed Products in the prior six (6) month period.

**10.4.**  <u>Survival</u>. Sections 8, 10.4, 10.5, 11, 12, 13, 14, 16, 17, 18, 18 and each other provision of this Agreement that by its nature extends beyond the expiration or termination of this Agreement, will survive and continue in full force and effect after the Term.

**10.5.**  <u>Licensor's Obligation to Purchase Licensee's Business</u>. If Licensor delivers a written notice of non-renewal to Licensee under Section 10.2, or terminates this Agreement under Section 10.3(a) or Section 10.3(d), then Licensor will be obligated to purchase the Licensee Business within 90 days after the effective date of such termination, for the Purchase Price. For the purposes of this Section, "Purchase Price" means all of the following: (A) Licensor's assumption of all liabilities and expenses associated with the Licensee's Business as identified on a schedule to be provided by Licensee, including, but not limited to, those associated with inventory and packaging; (B) the fair market value for all molds, materials, equipment and other assets associated with or used in the Licensee Business, as mutually agreed upon by the Parties, provided, however, if the Parties cannot mutually agree within 30 days after the effective date of termination, then such fair market value will be determined by an independent financial appraiser mutually agreeable to the Parties; provided that if the Parties cannot agree upon a financial appraiser to conduct the appraisal, the Parties will submit the valuation issue to arbitration in accordance with the commercial arbitration rules of the American Arbitration Association. The cost of any appraisal or arbitration pursuant to this Section will be shared equally by the Parties; and (C) additional amounts calculated as follows:

(a)  If termination is effective on the third (3rd) anniversary of the Effective Date, or between the third (3rd) and fourth (4th) anniversary of the Effective Date, then Licensor will also pay Licensee 1.5 times Licensee's Net Sales from the Licensee Business during the 12 month period immediately preceding the effective date of termination, with such Net Sales determined based on the Net Sales used for purposes of the royalty calculations provided under this Agreement;

(b) If termination is effective between the fourth (4th) and fifth (5th) anniversary of the Effective Date, then Licensor will also pay Licensee: (i) 1.5 times an amount equal to two-thirds (2/3) of Licensee's Net Sales from the Licensee Business during the 12 month period immediately preceding the effective date of termination, with such Net Sales determined based on the Net Sales used for purposes of the royalty calculations provided under this Agreement; plus (ii) 7 times an amount equal to one-third (1/3) of EBITDA for the Licensee Business during the 12 month period immediately preceding the effective date of termination; and

(c) If termination is effective after the fifth (5th) anniversary of the Effective Date, then Licensor will also pay Licensee: (i) 1.5 times an amount equal to one-half (1/2) of Licensee's Net Sales from the Licensee Business during the 12 month period immediately preceding the effective date of termination, with such Net Sales determined based on the Net Sales used for purposes of the royalty calculations provided under this Agreement; plus (ii) 7 times an amount equal to one-half (1/2) of EBITDA for the Licensee Business during the 12 month period immediately preceding the effective date of termination.

11. **Rights to Manufacture and Sell Licensed Products After Term.** Following the expiration or termination of this Agreement for any reason, Licensee has the option, but not the obligation, to manufacture, sell or otherwise dispose of any Licensed Products that are at the end of the Term in inventory, in the process of manufacture, or subject to executed purchase orders (collectively the "Remaining Inventory"). Licensee retains the right to continue to manufacture, sell or otherwise dispose of the Remaining Inventory, subject to the requirements of this Agreement, including the obligation to pay royalties on the Net Sales from the sale of the Remaining Inventory. If Licensee does not exercise its option, Licensor shall be obligated to purchase the Remaining Inventory from Licensee at a price to be mutually agreed upon.

12. **Rights of First Refusal.**

12.1. **Grant of Refusal Right.** Licensor grants Licensee a right of first offer and right of first refusal with respect to the anticipated direct or indirect (including by reason of change of control of Licensor) sale or other transfer of, or receipt of an offer to purchase or otherwise acquire, any one or combination of the following (each individually an "Asset," and, collectively, the "Assets"):

(a) All or substantially all of the assets, tangible and intangible, owned or utilized by Licensor in the operation of its business, including without limitation its business goodwill; or

(b) Any or all of the Licensed Technology.

Such rights of first offer and first refusal will be referred to in this Agreement, both together, and separately as the case may be, as the "Refusal Right." For purposes of this Section 12, "change of control of Licensor" means (a) the acquisition by any person, in one or a series of transactions, of 33% or more of the total voting power of Licensor, directly or indirectly, including by sale, merger, reorganization or other corporate transaction, (b) a merger or consolidation of Licensor with another person in which Licensor is not the surviving entity, or (c) a reverse merger in which Licensor is the surviving entity but in which the shareholders of Licensor immediately prior to such reverse merger own less than 67% of the Licensor voting power immediately after the transaction, or (d) the filing by Licensor of a registration statement or similar securities offering document with a governmental agency with respect to the initial public offering of securities of Licensor (an "IPO Filing").

12.2. **Procedure.** Prior to (a) soliciting any offer for sale or other direct or indirect transfer of any or all of the Assets or any ownership interest in any of the Assets (including without limitation a proposed transfer to a subsidiary or other affiliate of Licensor), (b) making an IPO filing, or (c) accepting

any offer from a third party to purchase or otherwise acquire any or all of the Assets, or any ownership interest in any of the Assets, Licensor will promptly provide Licensee notice of its (i) intent to solicit, (ii) intent to file, or (iii) offer received, and deliver to Licensee, as applicable, either (1) a written term sheet describing the terms under which Licensor would offer to sell the Assets, or (2) a copy of the third party offer to purchase the Assets which Licensor is prepared to accept (such term sheet or written offer, as the case may be, the "Proposed Terms"). Licensee will, within thirty (30) business days after its receipt of the Proposed Terms (the "Consideration Period"), take one of the following actions:

    (a)    Provide notice to Licensor of exercise of its Refusal Right without qualification by accepting the Proposed Terms, in which case the Parties will promptly commence negotiation of a definitive purchase agreement and other related documents (collectively, the "Definitive Agreements") for Licensee's purchase and Licensor's sale of the Assets, reflecting the Proposed Terms; or

    (b)    Provide notice to Licensor of exercise of its Refusal Right (the "Qualified Exercise Notice"), subject to determination of the fair market value of the Assets and negotiation of alternative terms for Licensee's purchase of the Assets from Licensor, in which case the Parties will follow the procedures set forth in Section 12.5 below; or

    (c)    Provide notice to Licensor of waiver of its Refusal Right, or fail to provide notice as described in Section 12.2(a) or 12.2(b) above, prior to expiration of the Consideration Period.

    **12.3.**    <u>Waiver of Refusal Right</u>. If Licensee waives or does not exercise its Refusal Right prior to the expiration of the Consideration Period, then Licensor may proceed with (a) the solicitation of offers for the Assets from third parties, (b) its IPO filing, or (c) sale of the Assets to a third party on the Proposed Terms, as applicable; provided that:

    (a)    Any proposed sale of the Assets to a third party on terms (including without limitation with respect to the Assets acquired, price, payment, treatment of Licensor liabilities, representations and warranties, covenants, indemnification and closing date) that differ in any material respect from the Proposed Terms as rejected by Licensee will be subject to the Refusal Right described above and will be deemed new Proposed Terms to be promptly provided to Licensee and subject to the process described in Section 12.2 above, and

    (b)    If Licensor does not consummate the sale or other transfer of the Assets to a third party on the Proposed Terms within six months of Licensee's waiver or failure to exercise its Refusal Rights (as applicable other than in the case of a proposed IPO), then Licensor must provide written notice to Licensee of such failure to consummate the sale, and Licensor must resubmit the Proposed Terms to Licensee prior to selling the Assets, and such terms will again be subject to the process described in Section 12.2 above.

    **12.4.**    <u>Agreement Not to Transfer</u>. From and after the beginning of the Consideration Period, and prior to Licensee's waiver or failure to exercise its Refusal Right, Licensor will not transfer or agree to transfer the Assets, or engage in discussions with third parties regarding the transfer of the Assets, and will operate its businesses in the ordinary course consistent with past practice to maintain the value of the Assets. Any purported transfer of the Assets by Licensor in violation of this Agreement will be null and void and will not affect the ownership of the Assets. Licensor agrees that any purported transfer of the Assets in violation of this Agreement may and should be enjoined.

    **12.5.**    <u>Qualified Exercise Notice</u>. If Licensee provides Licensor a Qualified Exercise Notice, then the following terms will apply:

(a)  The appropriate officers of Licensee and Licensor will, for a period of 30 days from Licensee's provision of the notice, negotiate in good faith (the "Management Discussions") with respect to the fair market value of the Assets and other terms of Licensee's proposed purchase of the Assets from Licensor.

(b)  If the Management Discussions do not result in an agreement between the Parties with respect to such price, Licensee will provide to Licensor, within thirty (30) days of the termination of the Management Discussions, a list of not fewer than three unrelated neutral appraisers, each of whom will have had experience as an appraiser of assets similar to the Assets that are subject to the Proposed Terms, (2) have working knowledge of current market conditions and practices and (3) have not performed any services for any Party to this Agreement for a period of twenty-four (24) months prior to its proposed retention under this Agreement. Licensor will pick a single appraiser from the list. If Licensor does not make a choice within fifteen (15) days after Licensee's provision of the list, Licensee may do so.

(c)  The determination of the appraiser will be limited solely to the determination of the fair market value of the Assets as of the date of the Qualified Exercise Notice. The cost of the appraiser will be shared equally by Licensee and Licensor.

(d)  The appraiser will have the opportunity to request such Licensor information that the appraiser reasonably determines is relevant to the determination of its fair market value of the Assets. Licensor will respond to any such request within three (3) business days and provide either the requested information or a representation that such information does not exist. Copies of all such communications between the appraiser and Licensor will be provided to Licensee in a timely manner. In addition, the appraiser will have the opportunity to meet with and make inquiries of Licensor management at a mutually agreeable time and place.

(e)  The appraiser will, within sixty (60) days of the appraiser's appointment, provide each Party a written appraisal report describing the fair market value of the Assets (the "Fair Market Appraisal"). The Fair Market Appraisal will establish the purchase price of the Assets subject to the Refusal Right.

**12.6.**  **Effect of Fair Market Appraisal.** Following provision of the Fair Market Appraisal under Section 12.5 above, if applicable, the Parties will proceed as follows:

(a)  Licensee may provide notice to Licensor within fifteen (15) days of its receipt of the Fair Market Appraisal of its offer to complete the sale of the Assets at the price set forth in the appraisal (the "Fair Market Value Offer Notice"). Licensor will thereafter provide notice to Licensee within fifteen (15) days of its receipt of such notice from Licensee of its acceptance or rejection of such offer.

(b)  If the Parties wish to complete the sale of the Assets at the price set forth in the Fair Market Appraisal, then the Parties will negotiate in good faith and seek to enter into a Letter of Intent based on the Fair Market Appraisal within thirty (30) days of their receipt of the Fair Market Appraisal, and promptly thereafter commence good faith negotiation of Definitive Agreements for Licensee's purchase and Licensor's sale of the Assets on the terms set forth in the Letter of Intent.

(c)  If (1) Licensee provides notice to Licensor of its waiver of its Refusal Right based on the Fair Market Appraisal, or (2) Licensee fails to provide a Fair Market Value Offer Notice to Licensor within fifteen (15) days of its receipt of the Fair Market Appraisal, Licensor may proceed with the marketing or sale of the Assets; provided that (i) any offer from a third

party at a price other than the Fair Market Appraisal will be subject to the Refusal Right described above, and (ii) if Licensor does not consummate the sale or other transfer of the Assets to a third party at the Fair Market Appraisal price within six months of Licensee's waiver or failure to exercise its Refusal Right under this subsection, then Licensor must submit any third party offer to Licensee prior to selling the Assets, and such offer will be subject to Licensee's Refusal Right as described above.

(d)     If Licensor provides Licensee notice of its rejection of Licensee's offer following its receipt of the Fair Market Value Offer Notice as described in Section 12.6(a) above, Licensor will (A) concurrently reject any other pending third party offer, (B) discontinue soliciting offers for the sale or other transfer of the Assets for a period of one year from the date of such notice, or (C) withdraw any IPO filing and discontinue all efforts to effect an initial public offering of Licensor's securities for a period of one year from the date of such notice, and Licensee's Refusal Right as described above will continue in full force and effect.

12.7.   Licensor's Refusal Right. Licensee grants Licensor a Refusal Right identical the Refusal Right granted to Licensee above and on the same terms and conditions as granted by Licensor to Licensee above.

13.   **Confidentiality; Protection of Trade Secrets.** The Parties acknowledge and agree that the terms of the Confidentiality and Non-Circumvention Agreement entered into by and between the Parties as of March 8, 2012 shall govern the exchange of Confidential Information (as defined therein) between the Parties and the terms of such agreement shall be incorporated by reference herein.

14.   **Representations and Warranties of Licensor.** Licensor represents and warrants to Licensee that: (a) Licensor or its affiliate is the sole owner of the Licensed Technology and the Licensed Marks, free and clear of all liens and encumbrances; (b) Licensor has the right to enter into this Agreement and to grant the licenses described in Section 2; (c) Licensor will not be in violation, breach or default of any other agreement to which it is a party by reason of entering into or performing under this Agreement; and (d) Licensee will not violate any third party's Intellectual Property Rights through Licensee's use of the Licensed Technology or the Licensed Marks, or Licensee's sale of the Licensed Products in accordance with this Agreement.

15.   **Representations and Warranties of Licensee.** Licensee represents and warrants to Licensor that: (a) Licensee has the right and authority to enter into this Agreement; (b) Licensee will not be in violation, breach or default of any other agreement to which it is a party by reason of entering into or performing under this Agreement; and (c) other than Licensee's use of the Licensed Technology or the Licensed Marks, Licensee will not violate any third party's rights in performing its obligations under this Agreement.

16.   **Indemnification.**

16.1.   <u>Obligations</u>. Licensor will indemnify, defend, and hold harmless Licensee, its affiliates, and their respective officers, directors, managers, members, shareholders, employees and agents (collectively, the "<u>Licensee Indemnitees</u>") from and against all Losses asserted directly or indirectly by any other person for any actual or alleged: (a) infringement of any Intellectual Property Right of that other person, or misappropriation or unauthorized use or disclosure of any trade secret of another person, by Licensor, the Licensed Technology, or the Licensed Marks; (b) negligent act or omission by Licensor; (c) breach of any representation, warranty or covenant in this Agreement by Licensor; (d) intentional misconduct by Licensor; or (e) violation of any applicable law by Licensor; in each case, whether arising out of, resulting from, or in connection with a demand, action, regulatory action, lawsuit, proceeding (including proceedings under the US Bankruptcy Code), judgment, settlement, appeal or other post

judgment proceeding and whether asserted in contract, tort, strict liability or otherwise. Likewise, Licensee will indemnify, defend, and hold harmless Licensor, its affiliates, and their respective officers, directors, managers, members, shareholders, employees and agents (collectively, the "Licensor Indemnitees") from and against all Losses asserted directly or indirectly by any other person for any actual or alleged: (a) infringement of any Intellectual Property Right of that other person, or misappropriation or unauthorized use or disclosure of any trade secret of another person, by Licensee; (b) negligent act or omission by Licensee; (c) breach of any express or implied warranty of merchantability or fitness for a particular purpose of Licensed Products manufactured by or at the direction of Licensee; (d) intentional misconduct by Licensee; or (e) violation of any applicable law by Licensee; in each case, whether arising out of, resulting from, or in connection with a demand, action, regulatory action, lawsuit, proceeding (including proceedings under the US Bankruptcy Code), judgment, settlement, appeal or other post judgment proceeding and whether asserted in contract, tort, strict liability or otherwise.

**16.2.** Exceptions. For the purpose of this Section, "Indemnitee" means a Licensee Indemnitee or a Licensor Indemnitee, as applicable. The indemnification obligations described in Section 16.1 will not apply to a Loss to the extent that Loss was caused by: (a) the Indemnitees' negligent acts or omissions; (b) the Indemnitees' breach of any representation, warranty or covenant in this Agreement or elsewhere; (c) the Indemnitees' intentional misconduct; or (d) the Indemnitees' violation of any applicable law;

**16.3.** Additional Remedies. If the Licensed Technology is held in any infringement suit to infringe the Intellectual Property Rights of another person, and use of the Licensed Technology is enjoined, or if in Licensor's reasonable opinion the Licensed Technology is likely to become the subject of such a claim, Licensor will, at Licensor's own expense, and in the order provided here, and without limiting Licensor's indemnification obligations: (a) obtain a license for Licensee to continue using the Licensed Technology; or (b) modify or replace or re-perform the Licensed Technology so they become noninfringing while giving substantially equivalent performance. If neither of the preceding is commercially feasible, Licensee may elect to terminate this Agreement, and Licensor will refund all Earned Royalties paid by Licensee during the six (6) months prior to such termination.

**17.** **Entire Agreement; Amendment; Interpretation.** This Agreement constitutes the entire agreement between the Parties and supersedes all prior or contemporaneous agreements, understandings or representations by or among the Parties with respect to the subject matter hereof. This Agreement may not be modified or amended except in writing signed by both Parties. Section and paragraph headings are for convenience only and do not affect the meaning or interpretation of this Agreement. The words "includes" and "including" are not limited in any way and mean "includes or including without limitation." The word "person" includes individuals, corporations, partnerships, limited liability companies, co-operatives, associations, government bodies (private and public) and other natural and legal persons. The term "and/or" means each and all of the persons, words, provisions or items connected by that term; i.e., it has a joint and several meaning. The word "will" is a synonym for the word "shall." Both Parties have had the opportunity to have this Agreement reviewed by their attorneys. Therefore, no rule of construction or interpretation that disfavors the Party drafting this Agreement or any of its provisions will apply to the interpretation of this Agreement. Instead, this Agreement will be interpreted according to the fair meaning of its terms.

**18.** **Governing Law; Dispute Resolution.** This Agreement will be interpreted and construed in accordance with the laws of the State of Oregon, regardless of its choice of law provisions. All actions arising out of or in connection with this Agreement will be brought in the federal and state courts located in Portland, Oregon. Both Parties hereby irrevocably consent to the exclusive jurisdiction of such courts and waive any objections as to venue; they also waive any claim that such a forum is an inconvenient forum.

19. **Assignment.** Except as described in Section 2, neither this Agreement nor any of the rights or obligations hereunder may be assigned by either Party without the prior written consent of the other Party (such consent not to be unreasonably withheld with respect to an assignment in the event of a sale of all or substantially all of a Party's assets). This Agreement will be binding upon and inure to the benefit of Licensor, Licensee and their respective permitted assigns and successors in interest.

20. **Notices.** Each notice, consent, request, or other communication required or permitted under this Agreement will be in writing, will be delivered personally or sent by certified mail (postage prepaid, return receipt requested), or by a recognized US overnight courier, and will be addressed to the Parties' addresses set forth in the signature block at the end of this Agreement. Each Party may change its address for purposes of this Agreement by giving written notice to the other Parties in the manner set forth in this Section.

21. **Counterparts.** This Agreement may be signed in one or more counterparts, all of which together will constitute one and the same instrument. Facsimile or PDF signatures will be valid for all purposes of this Agreement.

**LICENSEE:**

One Pet Planet, LLC
203 SE Alder Street
Portland, OR 97214

By: _____
Name: _____
Title: _____

**LICENSOR:**

Sleash LLC
8156 S. Wadsworth Blvd., Suite E-349
Littleton, CO 80128

By: _____M/V_____
Name: ___Mike SABER_____
Title: ___President_____

## Exhibit A

### Licensed Marks

| Mark | App. No. | Filing Date | Reg. No. | Reg. Date |
|---|---|---|---|---|
| SLEASH word mark | 85/065,893 | 6-17-10 | 4,020,413 | 8-30-11 |
| SLINGER word mark | 85/342,869 | 6-10-11 | 4,192,951 | 8-21-12 |
| SCHLEP-ALL word mark | 85/342,871 | 6-10-11 | 4,098,571 | 2-14-12 |
| STYLISH STRIDER word mark | 85/342,872 | 6-10-11 | 4,087,605 | 1-17-12 |

### Licensed Copyrights

| Title | Reg. No. | Reg. Date |
|---|---|---|
| SLEASH logo | VA 1-787-709 | 8-4-11 |
| Sammy Sleash Leaning on Slinger artwork | VA 1-787-708 | 8-4-11 |

## Exhibit B

### Patent Rights

| Title | App. No. | Filing Date | Pat. No. | Issue Date |
|---|---|---|---|---|
| Leash System and Method of Use | 12/871,609 | 8-30-10 | | |
| Recreational Throwing Apparatus and Corresponding Objects Therefor | 12/860,703 | 8-20-10 | | |
| Ball | 29/387,480 | 3-14-11 | D658,243 | 4-24-12 |
| Ball | 29/401,385 | 9-12-11 | D660,384 | 5-22-12 |

## Exhibit C

## Licensed Products Purchased

Slinger handles and ball toys

[To be inserted by Mike and Joe]

035233/00002/4127284v8