IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**SLEASH, LLC**, *a Colorado Limited Liability Company*,

            Plaintiff,

    v.

**ONE PET PLANET, LLC**, *an Oregon Limited Liability Company*; **AMAZING PET PRODUCTS**, *an Oregon Limited Liability Company*; and **CHOO CHOO IMPORTS, LLC**, *an Oregon Limited Liability Company*,

            Defendants.

Case No. 3:14-cv-00863-ST

**OPINION AND ORDER**

Stephen B. Mosier, HAYES SOLOWAY P.C., 4640 E. Skyline Drive, Tucson, AZ 85718; Johnathan E. Mansfield, MANSFIELD LAW, 121 S.W. Morrison, Suite 400, Portland, OR 97204. Of Attorneys for Plaintiff.

David S. Aman and Eric Beach, TONKON TORP LLP, 1600 Pioneer Tower, 888 S.W. Fifth Avenue, Suite 1600, Portland, OR 97204. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

       Although motions for a preliminary injunction in trademark disputes often are mired in

the complexities of trademark law, this case turns more on questions of contract interpretation.

PAGE 1 – OPINION AND ORDER

Plaintiff Sleash, LLC ("Plaintiff" or "Sleash") asserts that Defendant One Pet Planet, LLC ("OPP") no longer has the right to use Plaintiff's registered trademarks Sleash® and Slinger®. Under a license agreement with Sleash, OPP either still has or once had a contractual right to use licensed technology and trademarks owned and developed by Sleash related to the market for pet specialty products. Plaintiff seeks a preliminary injunction prohibiting OPP and related companies Amazing Pet Products and Choo Choo Imports, LLC (collectively "Defendants") from selling plush, disc, and disc-like dog toy products bearing the trademark "Slinger®," shipping out of the United States any such products bearing the trademark "Slinger®," operating the website www.slingertoy.com that promotes the sale of such products, and shipping any and all products allegedly falsely marked with patent numbers. For the reasons stated below, Plaintiff's motion is denied.

## STANDARDS

Rule 65(b) of the Federal Rules of Civil Procedure and 15 U.S.C. § 1116(a) of the Lanham Act provide that a court has the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title." 15 U.S.C. § 1116(a).

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20 (rejecting the Ninth

Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

## FACTUAL FINDINGS

The Court held an evidentiary hearing on June 9, 10, and 11 2014, receiving both testimony and exhibits. Based on this evidence the Court makes the following findings of fact.

### A.  Sleash and Slinger Pet Products

In 2010, Joseph A. Buescher ("Buescher") and Michael A. Saber ("Saber") invented a dog toy system called "Slinger" (referred to as "Slinger" or the "Arm System"). The system includes a "wand" or "arm" that is configured with a handle at one end and at the other end a structure that fits into a pocket or similar structure fastened to a dog toy. After the structure is attached to a toy, the toy may be thrown or launched by manipulating the wand or arm. There are several types of dog toys that Buescher and Saber designed for the system, including a ball, a disc-like device, and plush toys. Buescher and Saber specifically designed these toys with shape, material, and manufacturing processes in mind. In the spring of 2010, Buescher and Saber formed Sleash, LLC to market and sell the Arm System and associated products (collectively the

"Sleash Pet Specialty Products") into the pet specialty market, which is the market segment to which products are made and sold for use with or by canines found within households.

Sleash began selling the Arm System and associated products under the trademarks "Sleash" and "Slinger" in May 2011. Sleash's sales of the Sleash Pet Specialty Products exceeded $10,000 in 2011. Sleash used the trademarks "Sleash" and "Slinger" continuously between May of 2011 through December 28, 2012. Buescher and Saber, however, did not have a dedicated sales force to market the Sleash Pet Specialty Products.

**B.  Operative License Agreement and Negotiating History**

In June of 2012, Michael Laskey ("Laskey"), a businessman in the pet products market segment and an investor in OPP, introduced Buescher and Saber to Michael Twain ("Twain"), the manager and owner of OPP. Buescher contends that between August 2012 and December 2012, he and Saber identified to OPP all the materials and suitable processes needed to make the Sleash Pet Specialty Products. Buescher further contends that Twain and OPP represented to Buescher that OPP would be able cost effectively to manufacture the Sleash Pet Specialty Products in volume in China within about three to four months. Buescher believed that OPP could cause OPP's overseas manufacturers to produce the Sleash Pet Specialty Products at a low cost while using the same or similar materials to maintain and even exceed the same high quality of Slinger® products. According to Laskey and Twain, the original Sleash prototypes used materials that rendered the profit margin on the Sleash Pet Specialty Products uneconomical. Thus, Twain contends that the material lists Sleash provided to Twain in October 2012 were to be used only as the starting point in his efforts to make the Sleash Pet Specialty Products salable and profitable.

In December of 2012, OPP and Sleash began exchanging proposed drafts of a license agreement. On December 28, 2012, Sleash signed the agreement ("License Agreement") that

PAGE 4 – OPINION AND ORDER

governs the business relationship between the parties that is at issue in this case. There are five

sections of the License Agreement relevant to the parties' dispute: (1) Section 2.2, titled

"Licensed Marks"; (2) Section 5.4, titled "Input of Materials"; (3) Section 10.3(b), titled

"Termination"; (4) Section 18, titled "Governing Law; Dispute Resolution"; and (5) Section 20,

titled "Notices." The relevant drafting exchanges for each section is summarized below, in which

Sleash is referred to as the "Licensor" and OPP is referred to as the "Licensee." The term

"Licensed Marks" refers to Sleash's registered trademarks Sleash® and Slinger®. The term

"Licensed Products" refers to the Sleash Pet Specialty Products.

### 1.  Section 2.2 "Licensed Marks"

Section 2.2 provides in relevant part:

> Licensor hereby grants to Licensee an exclusive, sublicensable,
> irrevocable worldwide license to use the *Licensed Marks on or in
> connection with the manufacture, marketing, promotion, sale and
> distribution of Licensed Products during the Term*. . . .
> Specifically, Licensee agrees to maintain *commercially reasonable
> quality standards* as shall be prescribed by Licensor in writing *or
> as otherwise reasonable under the circumstances in the conduct of
> the business operations* with which the Licensed Marks are used.
> *Expressly under this license, Licensee shall use the Licensed
> Marks only in conjunction with Licensed Products that are offered
> for sale or sold by Licensee in accordance with the terms of this
> Agreement*. The Licensee hereunder expressly conveys no
> ownership interest in the Licensed Marks, which shall at all times
> under this Agreement be retained by Licensor.

 (emphasis added).

Before arriving at this text, however, the parties exchanged drafts of this provision,

among others. On December 19, 2012, the draft of Section 2.2 sent by Saber and his counsel to

OPP provided:

> Licensee agrees to maintain such quality standards as shall be
> prescribed by Licensor or as otherwise reasonable under the
> circumstances in the conduct of the business operations with which
> the Licensed Marks are used. Expressly under this license,

> Licensee shall use the Licensed Marks only in conjunction with Licensed Products that are offered for sale, or sold or rendered by Licensee in accordance with the terms of this Agreement and with the guidance and direction furnished to Licensee by Licensor, or its authorized representatives or agents, from time to time, if any; *but always the quality of the Licensed Products shall be satisfactory to Licensor or as specified by it, to the extent lawful and reasonable in the trade.*

(emphasis added).

On December 23, 2012, the draft of Section 2.2 was revised by OPP to read: "Licensee agrees to maintain ~~such~~ <u>commercially reasonable</u> quality standards as shall be prescribed by Licensor <u>in writing</u> or as otherwise reasonable under the circumstances in the conduct of the business operations with which the Licensed Marks are used." The parties then agreed to strike or modify the following text from Section 2.2, as indicated:

> Expressly under this license, Licensee shall use the Licensed Marks only in conjunction with Licensed Products that are offered for sale~~,~~ <u>or</u> sold ~~or rendered~~ by Licensee in accordance with the terms of this Agreement ~~and with the guidance and direction furnished to Licensee by Licensor, or its authorized representatives or agents, from time to time, if any; but always the quality of the Licensed Products shall be satisfactory to Licensor or as specified by it, to the extent lawful and reasonable in the trade~~.

There were no other exchanged drafts before the final text agreed upon by the parties on December 28, 2012 and summarized above.

### 2. Section 5.4 "Input of Materials"

Section 5.4 of the License Agreement provides: "The Parties will in good faith and within a reasonable time jointly approve the materials to be used in manufacturing the Licensed Products."

The first marked draft of Section 5.4, provided by Sleash on December 19, 2012, revised Section 5.4 to read as follows: "<u>The parties</u> ~~Licensee~~ will ~~consider,~~ in good faith <u>and within a reasonable time jointly approve</u>~~, Licensor's input and suggestions regarding Licensee's choice of~~

the materials to be used and any material design changes in the Licensed Products." On December 23, 2012, the draft of Section 5.4 exchanged by the parties read: "The parties will in good faith and within a reasonable time jointly approve the materials to be used ~~and any material design changes~~ in manufacturing the Licensed Products." There were no other exchanged drafts before the final text agreed upon by the parties on December 28, 2012 and summarized above.

   **3.   Section 10.3 "Termination"**

Section 10.3(b) provides in relevant part: "Either Party may terminate this Agreement, effective immediately, in the event the other Party materially breaches any of the covenants, terms or conditions in this Agreement, and fails to cure that breach within 45 days after written notice of such breach." The parties did not engage in any substantive negotiation regarding the terms of this provision.

   **4.   Section 18 "Governing Law; Dispute Resolution"**

Section 18 provides in relevant part: "This Agreement will be interpreted and construed in accordance with the laws of the State of Oregon, regardless of its choice of law provisions." The parties did not engage in any substantive negotiation regarding the terms of this provision.

   **5.   Section 20 "Notices"**

Section 20 of the License Agreement reads: "Each notice, consent, request, or other communication required or permitted under this Agreement will be in writing, will be delivered personally or sent by certified mail (postage prepaid, return receipt requested), or by a recognized US overnight courier, and will be addressed to the Parties' addresses as set forth in the signature block at the end of this Agreement. Each Party may change its address for purposes of this Agreement by giving written notice to the other Parties in the manner set forth in this Section." The parties did not engage in any substantive negotiation regarding the terms of this provision.

PAGE 7 – OPINION AND ORDER

**C.  OPP's Production and Sale of Sleash Products**

Sleash contends that after signing the License Agreement and through mid-2013, OPP did not produce or offer for sale the Sleash Pet Specialty Products. In July of 2013, OPP first produced the Sleash Pet Specialty Products and provided the products to Sleash for demonstration and review. Sleash contends that it rejected these samples because of its belief that they were of poor quality. After Sleash's rejection of these samples, Twain of OPP offered to change Sleash's agreed royalty rate to 10 percent of "Net Sales," the highest amount provided under the sliding scale License Agreement. In December 2013, OPP again acknowledged in an email to Sleash that the Sleash Pet Specialty Products being made by OPP had quality issues. Twain told Sleash that he was not satisfied with the pocket stitching because he believed the pocket could easily tear.

OPP delivered the first set of products in July 2013. OPP asserts that it worked extensively to lower the price of the materials used in making the Sleash Pet Specialty Products. OPP also developed an improved Arm System and ball toy using materials that deviated from the original product specifications from Sleash. OPP and Sleash agree that the materials used and the design of the ball toy and Arm System were an improvement from the original models provided by Sleash.

OPP provided the next set of product samples to Sleash in February 2014. These samples were produced by Choo Choo Imports, LLC in China and imported to OPP.  On March 1, 2014, Buescher wrote an email to Twain to give him "a quick shout out and say thanks for the samples." Buescher explained that Sleash would "do a detailed analysis" and record its and its investors' thoughts. OPP began to make sales of the Sleash Pet Specialty Products in March 2014 and sent Sleash its first royalty payment under the License Agreement in approximately May 2014.

PAGE 8 – OPINION AND ORDER

**D.  Alleged Notice of Breach and Termination of the License Agreement**

On March 3, 2014, Buescher and Saber sent an email to Twain, Laskey, and Bill

Schiaffino ("Schiaffino"), investors or employees of OPP, stating that the product samples were

not acceptable. That email stated:

> Michael, Mike and Bill
>
> We have been playing with the products you sent us, and *we wanted to share some thoughts*. Detailed observations are attached, but to provide a short synopsis here—*we are very concerned*, and some of our investors are as well as they have played with the toys.
>
> We hate to say this at this juncture—as we have been waiting so very long for this time to come—but we believe there are several pretty major issues in play with the product line—and we believe that *these things* (the major ones at a minimum) *need to be addressed* before the product starts moving heedlessly into the market. This fits with your philosophy as well . . . "One that says *it's better to take longer and get it right*, than release product into the marketplace and get it wrong." You also indicated several weeks ago in an email that you were working on a couple of these things as a very high priority so this information should not be a surprise to you (disc pockets and gripping of Rubber line (putting stoppers in)).
>
> One Pet Planet licensed the SLEASH product line to improve it and make it ready for mass market retail. Price points have been addressed and improved—which is great—but the products rec'd [received] this past week make it clear that the Quality and the Materials of *the new line is not yet ready* for mass market release. Given we were not provided any samples the entire last year even though we repeatedly asked for them, we did not have an opportunity to provide feedback earlier.
>
> *We'd like to discuss* what's being done to address the major issues when we are all in Orlando. *We'd also like to discuss the fix timeline*, which we can only hope is as fast as humanly possible. In fact, we believe containers that have yet to ship from China should be held—to minimize overall damage to the brand and image. Proper release to the market is of utmost concern. *Thanks for your prompt attention.*
>
> Joe and Mike

(emphasis added). Sleash attached tables to this email assessing the quality of the Slinger handle, rubber toys, plush toys, and disc toys. For each product, Sleash assigned the following grades, "overarching comments," and "bottom line" assessments:

(1)    Slinger handle: A-. Overarching Comments: "Clean and sturdy." Bottom Line: "No major issues here, but some materials testing is a good idea."

(2)    Rubber toys: B-. Overarching Comments: "There are some major issues here that we believe need to be addressed. Noting here that we haven't tested the durability of these toys yet." Bottom Line: "Suggest continued study of raw materials . . . [and] suggest that updates to molds be considered—this to ensure that the slinger paddle can't be inserted too far into the toys."

(3)    Plush Toys: C+. Overarching Comments: "There are some major issues here that we believe need to be addressed." Bottom Line: "The pockets on these toys must be revisited. Also believe that addressing some other things will help a lot as well."

(4)    Disc toys: D. Overarching Comments: "SLEASH LLC is very disappointed with the disc toys. This is going to sting, but . . . _Units like the ones we received should NOT be offered for sale_. There are too many issues with these—most of which are major—to even attempt to share them with the public. We are pred[i]cting now that these will be a failure in the marketplace, and be a huge black eye for the entire line." Bottom Line: "SLEASH LLC suggests—most sincerely and adamantly—that these units not be offered for sale."

(Emphasis in original).

On March 4, 2014, Laskey responded to Buescher and Saber, explaining that the quality issues noted in the March 3, 2014 email had not been observed by prospective OPP customers. Laskey further explained that it was OPP's opinion "that the product we now have to sell is the right product at the right price and it is doing and will do very well." That same day, Saber responded to Laskey's email by stating that: "Good dialog [sic] is the way to go here, and it's good to know everyone is trying stuff out." Saber also stated that Sleash's experience testing out the products with customers was not successful. Saber noted that the "slinger itself [was] okay," that the "rubber balls [were] okay," but that the "plush toys [were] a C grade material" and the "discs [were] no good." Saber concluded:

> In closing . . . The truly unfortunate thing here is that we are just now getting samples. We are all frothing at the mouth to go sell and make money, but we can't let that cloud our judgment at this critical juncture. Some issues—most notably in the plush and disc areas—need to be addressed.

On March 5, 2014, Saber wrote an email to Twain. In that email, Saber noted that he and Buescher "believe[d] that some adjustments—some of which will be fairly easy to do (and low cost)—will help a ton." Saber expressed his desire that the pockets for the plush and disc toys use a specific fabric, and noted that Sleash was "literally begging [OPP] to use" that fabric. Saber discussed either delivering the fabric to OPP in Orlando, Florida on March 13, 2014, or shipping the materials through the mail. Finally, Saber noted that he and Buescher would arrive at the Orlando for a pet toy trade show "ready to work and SELL." Later in March, Buescher and Saber were in contact with OPP and its representatives regarding the Orlando trade show, a pet expo in Denver, Colorado, Sleash providing OPP with prototypes for development, and Twain's upcoming trip to China to research improved manufacturing processes and materials for the Sleash Pet Specialty Products. On April 8, 2014, Buescher contacted OPP to confirm that Sleash could sell its existing inventory and finish a small order. Two days later on April 10, 2014,

Sleash sent OPP a new display for the Slinger line and, during an email exchange, confirmed that OPP was "sending out lots of Slinger."

Sleash contends that there were no intervening actions by OPP to cure the "deficiencies" noted in the March 3 through 5, 2014 exchange of emails. As a result, on April 18, 2014, Sleash sent written notice to OPP terminating the License Agreement. Sleash wrote that OPP was in breach of the License Agreement, based on Sleash's belief that the License Agreement entitled Sleash to approve the product line jointly (Section 5.4), the requirement that OPP maintain commercially reasonable standards (Section 2.2), and OPP's obligation as an exclusive licensee to "exploit and generate revenue to and for the licensor." Sleash also stated that it believed the License Agreement was legally defective for various reasons. Sleash proposed entering into a new license agreement with different terms and requested that OPP pay Sleash's legal fees related to that matter.

On April 22, 2014, OPP notified Sleash of OPP's contention that it was not in breach of the License Agreement, would continue to operate in good faith under the terms of the License Agreement, and that it was Sleash rather than OPP that was in material breach by selling competing products on Sleash's website. OPP declined "to pay for Sleash to hire lawyers to renegotiate a deal that OPP intends to honor."

On May 9, 2014, Twain sent Buescher and Saber pictures of improvements on the flying disc products. OPP contends that even after the April 18 termination notice from Sleash, OPP continued to honor the License Agreement between the parties because it believed it was not in breach of the agreement.

**E.  Sleash and "Acme"**

Before Sleash sent its email on March 3, 2014, Sleash also had been in contact with another supplier and manufacturer of pet products, which, to protect confidential and

competitively sensitive information, the Court will refer to by the pseudonym "Acme" and Acme's principals with the pseudonym "Acme Principal." On February 24, 2014, Saber was in touch with Acme Principal 1 ("AP1") to arrange a time to discuss "a number of things . . . both in—and out—of the pet world." Saber was interested in speaking with Acme because if its manufacturing savvy and requested that Acme sign a nondisclosure agreement. AP1 responded on February 25, 2014, by requesting a "link to review the toy again." On February 26, 2014, Saber provided AP1 with a link to www.sleash.com. On March 4, 2014, Saber was again in touch with AP1 and other individuals regarding a time to meet and stating that Sleash received "some new prototypes just this afternoon."

On March 16, 2014, Buescher sent an email to AP1 and Acme Principal 2 ("AP2") and copied Saber. Buescher stated that it "was a pleasure to meet and discuss options with you both." Buescher stated that without any royalties he and Saber were in "major cash crunch mode" but wanted to fly out to Acme to discuss various topics, including "what 'options' we may have with our main Slinger Product line." On March 18, 2014, AP2 responded to Buescher's email with the following, regarding the Slinger pet products: (1) "there is no question that [Acme] could manufacture a high quality product at a better price than [Sleash's] current supplier"; (2) the name of Acme's patent attorney; and (3) that if Sleash "would like [Acme] to quote [Sleash's] product then [Acme] would need a sample." AP2 concluded that, with regard to a potential working relationship, Acme "would license, manufacture, market and sell [Sleash's] product— and [Sleash] would receive a quarterly royalty based on net sales." The context of the email indicates that Sleash was asking Acme to estimate Acme's production costs to manufacture the Sleash Pet Specialty Products.

Throughout April of 2014, Acme and Sleash remained in contact and discussed taking the "exciting new venture to the next level." Sleash also confirmed that it sent a "box of goodies" to Acme that arrived safely. In response, AP1 wrote to Sleash: "I am sleeping with my flying Pig [a plush toy] and Sleash [the Arm System] by my side tonight[.] This toy rocks! Let's close this damn deal[.]" Sleash and Acme continued to discuss different product ideas, including the express mention of "Slinger" and the need to make improvements to the "flying pig" product. Acme sent Sleash an email with a "draft agreement" on April 12, 2014, and concluded the email by stating "Slinger has to perform like we all believe it will perform once manufactured, marketed and distributed properly."

Buescher and Saber traveled to meet with Acme in early May of 2014. In an email dated May 3, 2014, Saber attached a list of action items documented from that trip, including "OPP is top of the list." The "draft agreement" between Sleash and Acme was briefly put on hold pending the resolution of Sleash's dispute with OPP. On May 8, 2014, Buescher sent an email to AP1 and AP2 confirming that a letter went to OPP and that Sleash was able to sign an agreement with Acme. Sleash has not yet signed an agreement with Acme.

## CONCLUSIONS OF LAW

### A.  Plaintiff's Likelihood of Success

To prove trademark infringement under the Lanham Act, 15 U.S.C. § 1114, a plaintiff must prove: (1) ownership of a protectable trademark; and (2) that the defendant's use of the trademark is likely to cause consumer confusion. *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1202-03 (9th Cir. 2012). "Where a licensee persists in the unauthorized use of a licensor's trademark, courts have found that the continued use alone establishes a likelihood of consumer confusion." *Robert Trent Jones II, Inc. v. GFSI, Inc.*, 537 F. Supp. 2d 1061, 1065 (N.D. Cal. 2008) (quoting *Sun Microsystems v. Microsoft Corp.*, 938 F. Supp 612, 614-15 (C.D.

PAGE 14 – OPINION AND ORDER

Cal. 1998) (quotation marks omitted). A plaintiff makes a prima facie showing of ownership of a protectable trademark by producing a certificate of registration, *see* 15 U.S.C. § 1057(b). The "likelihood of confusion" standard "considers whether a reasonably prudent consumer in the marketplace is likely to be confused as to the origin or source of the goods or services bearing one of the marks or names at issue in the case." *Rearden*, 683 F.3d at 1209.

Sleash's ownership of the Slinger® and Sleash® marks is not disputed, at least for the purposes of the pending motion for preliminary injunction. Further, because OPP, a licensee of the marks in dispute, is using identical marks, OPP does not dispute, at least for the purposes of the pending motion, the issue of "likelihood of confusion." Therefore, Sleash's claim of trademark infringement is contingent only upon proper termination of the License Agreement or OPP operating outside the scope of the License Agreement. Accordingly, the Court begins its analysis with the question of whether the License Agreement between Sleash and OPP was effectively terminated on April 18, 2014. Next, the Court analyzes whether OPP's continuing activities fall within or outside the scope of the License Agreement. Unless OPP is authorized under the License Agreement to use the Sleash® and Slinger® trademarks, OPP is violating Sleash's rights as the registered owner of the disputed marks.

### 1. Contract Interpretation under Oregon Law

The License Agreement provides that it "will be interpreted and construed in accordance with the laws of the State of Oregon." Under Oregon law, the objective in contract interpretation is to give effect to the parties' agreed-upon intentions. *See, e.g.*, *Connall v. Felton*, 225 Or. App. 266, 272 (2009) ("The goal [of contract interpretation] is always to give effect to the parties' intentions."). Oregon courts have established a three-step process for interpreting the provisions of a contract. First, the court determines whether, as a matter of law, the relevant provision is ambiguous. *McKay's Mkt. of Coos Bay, Inc. v. Pickett*, 212 Or. App. 7, 12 (2007). In considering

whether a contractual provision is ambiguous, a court is limited to considering only the plain meaning of the words used by the parties in their contract and any extrinsic evidence showing the circumstances under which the contract was made. *See Batzer Constr., Inc. v. Boyer*, 204 Or. App. 309, 317-18 (2006); *Fogg v. Wart*, 2006 WL 3716745, at *5-7 (D. Or. Dec. 14, 2006); *see also* Or. Rev. Stat. § 42.220. "A contractual provision is ambiguous if its wording can, in context, reasonably be given more than one plausible interpretation." *Williams v. RJ Reynolds Tobacco Co.*, 351 Or. 368, 379 (2011) (citation omitted). In addition, "[t]he court must, if possible, construe the contract so as to give effect to all of its provisions." *Id.* If the provision is unambiguous, the analysis ends. *Id.*

Where a contractual provision is ambiguous, however, the factfinder must look beyond the four corners of the contract to discern, as a matter of fact, whether there is a mutual and common intention. *See Yogman v. Parrott*, 325 Or. 358, 363 (1997) (explaining that with an ambiguous contract provision the trier of fact will "ascertain the intent of the parties and construe the contract term consistent with the intent of the parties"). The trial court may receive and consider extrinsic evidence relating to intent in order to resolve that question. *Id.* at 363-64; *see also* Or. Rev. Stat. § 41.740 (extrinsic evidence is admissible to "explain an ambiguity" in a contract).

Oregon follows the objective theory of contracts, "under which objective manifestations of intent control rather than the parties' uncommunicated subjective understanding." *Butler Block, LLC v. Tri-Cnty. Metro. Transp. Dist. of Or.*, 242 Or. App. 395, 410 (2011). Therefore, direct evidence at this stage may include expressions of any such common understanding actually communicated among the parties, such as "the parties' communications and acts." *See Holdner v. Holdner*, 176 Or. App. 111, 120 (2001) (quoting *Real Estate Loan Fund Or. Ltd. v.*

*Hevner*, 76 Or. App. 349, 354 (1985)). Statements of a party's subjective intent that were not expressed or communicated at the time the contract was formed are not permissible evidence of intent. *See, e.g.*, *Fogg*, 2006 WL 3716745, at *9; *c.f. Holdner*, 176 Or. App. at 120-21.

In the absence of such direct evidence, the parties' course of dealing or their performance during the term of the contract may provide circumstantial, or inferential, evidence of their mutual and common understanding, if any, concerning the ambiguous provision. *See Yogman*, 325 Or. at 364 (the parties' "practical construction of an agreement may hint at their intention" (citing *Tarlow v. Arntson*, 264 Or. 294, 300 (1973)). In the absence of any direct or circumstantial evidence, or if the contract remains ambiguous after considering any such evidence, the third step involves application of any relevant maxims of construction. *See Yogman*, 325 Or. at 364.

### 2. Termination of the License Agreement

Sleash contends that it properly terminated the License Agreement on April 18, 2014. Sleash further argues that the March 3, 2014 email to Twain put OPP on notice that Sleash was terminating the License Agreement. OPP responds that Sleash failed to provide the required notice of the alleged breach to OPP with the required opportunity to cure, all as called for by the License Agreement Sections 10.3(b) and 20.

Under Oregon law, "[a]s a general rule, one who desires to exercise his right to terminate or rescind a contract must first give the opposing party notice that he is doing so." *Stovall v. Publishers Paper Co.*, 284 Or. 53, 57 (1978). This general rule becomes even more important where a "contract itself provides that a party may terminate the contract 'by notice.'" *Id.* (quoting 3 Black, On Rescission and Cancellation 1399, § 569 (2d ed. 1929)). A notice of termination "must be clear and unambiguous, conveying an unquestionable purpose to insist on the rescission." *Id.* (quoting 3 Black at 1413, § 574) (quotation marks omitted). Even if a notice

PAGE 17 – OPINION AND ORDER

of rescission is sufficient, "[w]here the conduct of one having the right to rescind a contract is ambiguous, and it is not clear whether he has rescinded it or not, he will be deemed not to have done so." *Id.* at 62 (quotation marks omitted). A notice of termination may be ambiguous by "mixing words of termination with words of compromise, negotiation, and present obligation." *Id.* at 61-62.

In *Stovall*, a plaintiff's counsel sent a letter to the defendant's counsel regarding an ongoing dispute related to the construction of a road required under a timber sale and logging agreement. *Id.* at 55-56. The first two paragraphs of the letter purported to terminate the contract, yet the third paragraph provided an outline of what conditions would be acceptable to plaintiff as an offer of compromise regarding the dispute. *Id.* at 58-59. The concluding paragraph stated: "The foregoing is submitted in the interest of compromise and may be accepted by written notice actually received by me at any time prior to 4:45 p.m., Tuesday, May 27, 1975. We otherwise intend to file our complaint immediately thereafter." *Id.* at 59 (quotation marks omitted). Justice Tongue, writing for the Oregon Supreme Court, concluded "that the notice of termination was not 'clear and unambiguous, conveying an unquestionable purpose to insist on the rescission,' and was therefore, as a matter of law, ineffective to terminate the contract." *Id.* at 60 (footnote omitted).

Such a notice requirement "makes sense given that a party to a contract without notice of its termination would, in all likelihood, continue to perform." *In re Greater Se. Cmty. Hosp. Found., Inc.*, 267 B.R. 7, 18 n.26 (Bankr. D.D.C. 2001) (citing *Stovall*, 284 Or. at 57). The focus, therefore, "is on whether the notice is sufficiently clear to apprise the other party of the action being taken." *Morris Silverman Mgmt. Corp. v. W. Union Fin. Servs., Inc.*, 284 F. Supp. 2d 964, 974 (N.D. Ill. 2003). Upon notice of a material breach, a party would be advised what the other

considers to be inadequate. *See Blaine Econ. Dev. Auth. v. Royal Elec. Co.*, 520 N.W.2d 473, 476-77 (Minn. Ct. App. 1994) (finding a "notice to cure" under a construction contract deficient because the notice neither informed the contractor that the problems were jeopardizing the contract nor directed the contractor to do anything about them within a specific time).

Specific notice of a breach allows the allegedly breaching party to mitigate damages and avoid future deficiencies in performance. *See* Restatement (Second) of Contracts § 241(d) (1981) (explaining that one of the factors in considering whether a breach is material is "the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances"); *U.S. for Use and Benefit of Cortolano & Barone, Inc. v. Morano Constr. Corp.*, 724 F. Supp. 88, 98-99 (S.D.N.Y. 1989) (explaining that a failure to provide an opportunity to cure affects the materiality of the plaintiff's alleged breach). This in turn also promotes the informal settlement of disputes and avoids litigation. *Alvarez v. Chevron Corp.*, 656 F.3d 925, 932 (9th Cir. 2011) (analyzing the purpose of the notice of breach provisions of the California Commercial Code and stating that "[t]he purpose of giving notice of breach is to allow the breaching party to cure the breach and thereby avoid the necessity of litigating the matter in court").[1]

---

[1] Under the Uniform Commercial Code, an opportunity to cure furthers "the Code's purpose of promoting the completion of deals and will minimize seller's liability for a non-conformity which is curable." Robert A. Hillman, *Keeping the Deal Together After Material Breach-Common Law Mitigation Rules, the UCC, and the Restatement (Second) of Contracts*, 47 U. COLO. L. REV. 553, 587 (1976). Similarly, the drafters of the Restatement (Second) of Contracts have lessened the impact of the material breach doctrine. Generally, "a material failure of performance . . . operates as the non-occurrence of a condition," and would prevent "performance of the duty from becoming due" and discharge "the duty when the condition can no longer occur." Restatement (Second) of Contracts § 237 cmt. a (1981). Although an opportunity to cure may not preclude damages for a material breach, before a contract is terminated there is ordinarily "some period of time between suspension and discharge, and during this period a party may cure his failure." *Id.* at § 242 cmt. a. Section 248 clarifies that a party who rejects the performance of another and gives an insufficient reason for that rejection

Under *Stovall*'s requirement that a notice of termination be "clear and unambiguous, conveying an unquestionable purpose," 284 Or. at 57 (citation and quotation marks omitted), such notices must be reasonably clear about three things: (1) that the party receiving the notice is alleged to be in breach of the contract; (2) what the noticing party believes to constitute the material breach of the contract, and thus informing the allegedly breaching party what it must do to cure the breach; and (3) a deadline by which the allegedly breaching party must cure the breach. The purported email notice of March 3, 2014, by Sleash does none of these things.

Sleash contends that it provided proper notice to OPP with the March 3, 2014 email to Twain, Laskey, and Schiaffino, through the parties' conduct after the March 3, 2014 email, or by the April 18, 2014 termination letter. Sleash is incorrect.

The March 3, 2014 email is insufficient to constitute notice under the License Agreement. The primary errors in Sleash's arguments are that the email is neither in the proper form of the notice required by Sections 10.3(b) and 20 of the License Agreement, nor, more significantly, is the content of the March 3, 2014 email sufficiently clear to put OPP on notice that it was allegedly in material breach of the License Agreement.

Regarding the issue of form, Section 20 requires that "[e]ach notice, consent, request, or other communication required or permitted under" the License Agreement "will be in writing, will be delivered personally or sent by certified mail (postage prepaid, return receipt requested), or by a recognized US overnight courier." Sleash sent OPP an email, which they concede is not the proper form of notice under the License Agreement. Sleash cites to *Education Logistics, Inc. v. Laidlaw Transit, Inc.*, 2011 WL 1838776 (D. Mont. May 13, 2011), for the proposition that a

---

may "so mislead the other party as to induce his failure to cure the defective performance or offer of performance within the time allowed by the agreement." *Id.* at § 248 cmt. b.

"failure to adhere to a technical element of a notice provision may be immaterial if an individual has knowledge of the notice." *Id.* at *2. In that case, the court reasoned that the "purpose of a notice and cure provision is to allow an opportunity to resolve disputes before resorting to the courts." *Id.* at *3. The court found that because the defendant had notice of the plaintiffs' belief that the defendant was in default and an opportunity to cure, coupled with the fact that the defendant did not alter its conduct, the defendant could not rely on a technical defect in notice. *Id.* The court concluded that "[a]ny departure from the notice and cure provision was technical— not material." *Id.* This case dealt with the interpretation of a contract under Montana law, *id.* at *2, which in light of *Stovall* may be different than Oregon law. In any event, the court's analysis depended on the party having received *actual* notice, despite the notice being in an improper form.

Regarding the contents of the March 3, 2014 email, Sleash is correct that the email did indicate that Sleash was unhappy with the materials used for the disc-like and plush toy products. The entire email, read in context, however, is more indicative of an ongoing discussion and negotiation between the parties than a clear notice of a material breach and intent to terminate. This point alone makes *Education Logistics* distinguishable on the facts. *Cf.* 2011 WL 1838776, at *2.

There are several other elements of the March 3, 2014 email that fail to satisfy the "clear and unambiguous, conveying an unquestionable purpose" standard from *Stovall*: the email never used the word "breach"; OPP had emailed Sleash several weeks earlier that OPP was working on the issues that Sleash raised in its March 3, 2014 email; Sleash said in the email that it wanted to address what would be done to resolve these issues when the parties were next in Orlando, Florida; Sleash said it would like to "discuss the fix timeline"; and Sleash only stated that it

thought the product shipments from China "should be held." The open-ended nature of the March 3, 2014 email does not satisfy the notice standards from *Stovall*. *See Stovall*, 284 Or. at 57. Moreover, the parties' conduct after March 3, 2014 is also more akin to an ongoing discussion and negotiation than it is to providing a clear notice of a material breach and an intent to terminate.

At the preliminary injunction stage, the court finds that there is not a substantial likelihood of success on the merits that the March 3, 2014 email constituted proper notice under the License Agreement. Nor are these even serious questions on that point. As a result, it is unlikely the License Agreement was effectively terminated on April 18, 2014.

### 3. Scope of the License Agreement

Sleash also argues, in the alternative, that OPP exceeded the scope of the License Agreement, specifically Section 2.2 and Section 5.4 because OPP's sale of Licensed Products that were not jointly approved by the parties. Sleash further argues that the principle of "naked licensing" means that OPP's production of the Sleash Pet Specialty Products that are inconsistent with Sleash's quality standards subjects OPP to liability for trademark infringement. OPP responds that, among other things, Section 2.2 of the License Agreement does not use conditional language and thus, any alleged failure by OPP to use approved materials pursuant to Section 5.4 at most establishes a claim for breach of contract and not trademark infringement.

#### a. Legal Standards

The scope of a license agreement embodied in the grant clause determines what a licensor will permit a licensee to do with the licensor's intellectual property. Cynthia Cannady, *Technology Licensing and Development Agreements* 125 (Oxford University Press 2013). To confer rights upon a licensee, the license grant "*must* be expressed using certain words that having meaning under the laws of intellectual property." *Id.* at 126 (emphasis in original). In the

context of trademark law, the owner of a trademark "has the right to exclude others from *using the mark in connection with the distribution* of goods, services and technologies." *Id.* (emphasis in original). Generally, where a licensee acts outside the scope of a license agreement, the licensor may sue for infringement. *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 939 (9th Cir. 2010). "Courts apply general principles of contract interpretation when interpreting the terms and scope of a licensing agreement." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 989 (9th Cir. 2006); *see also* Lorelei Ritchie, *Reconciling Contract Doctrine with Intellectual Property Law: An Interdisciplinary Solution*, 25 SANTA CLARA COMPUTER & HIGH TECH. L.J. 105, 144 (2008) ("[I]t is consistent with [*MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764 (2007)] to characterize contract law as properly governing intellectual property licensing disputes.").

### b. Naked Licensing

Sleash argues that the concept of "naked licensing" supports its argument that OPP is committing trademark infringement. Trademark licensing involves a unique issue related to an owner protecting the strength and validity of its mark. 3 *McCarthy on Trademarks and Unfair Competition* § 18:48 (4th ed. 2014) ("A branded product is not truly 'genuine' unless it has been made and distributed under quality controls established by the trademark owner. Thus, not only does the trademark owner have the right to control quality, when it licenses, it has the duty to control quality."). Specifically, "where the licensor fails to exercise adequate quality control over the licensee, 'a court may find that the trademark owner has abandoned the trademark, in which case the owner would be estopped from asserting rights to the trademark.'" *Barcamerica Int'l USA Trust v. Tyfield Imps., Inc.*, 289 F.3d 589, 596 (9th Cir. 2002); *accord FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 515 (9th Cir. 2010) (affirming summary judgment of

abandonment for lack of quality control). [2] A licensor's failure to exercise quality control is colloquially referred to as "naked licensing." *Id.* at 595-96.

Sleash's "naked licensing" argument presupposes that quality control provisions are necessary elements of a trademark license. That is not the case. *See Miller*, 454 F.3d at 992 (explaining that a "license agreement need not contain an express quality control provision because trademark law, rather than the contract itself, confers on the licensor the right and obligation to exercise quality control"). Sleash's "scope" argument thus turns on whether Section 5.4, which prescribes the approval process for input materials, is a covenant or a condition of the License Agreement. The fact that a license does not condition use of a mark on the licensor's quality standards does not establish the issue of infringement if the licensee was in fact granted the right to produce products without the licensors' control.

The real ramification of naked licensing is that a licensee's production of products can result in the abandonment of trademark rights by the licensor. *Barcamerica*, 289 F.3d at 598 (holding that Barcamerica, a vintner, engaged in naked licensing and abandoned its trademark by failing to retain or otherwise exercise adequate quality control over the trademark it had licensed to another company); *see also Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 368 (2d Cir. 1959) ("The absence . . . of an express contract right to inspect and supervise a licensee's operations does not mean that the plaintiff's method of licensing failed to comply with the requirements of the Lanham Act. Plaintiff may have in fact exercised control in spite of the

---

[2] Because of this risk, it is "[g]ood practice to incorporate quality control provisions by reference in every trademark license agreement (as an appendix)." Cannady, *Technology Licensing* at 137. It is also a good practice to include a provision in the license grant that: (1) "the license is *subject to* the licensee complying with the licensor's trademark guidelines and maintaining quality control over use of the mark;" (2) "the trademark guidelines may be amended from time to time and notified to licensee;" and (3) "the license may be terminated upon X days notice in licensor's discretion if licensee fails to comply." *Id.* (emphasis added).

absence of any express grant by licensees of the right to inspect and supervise.”). Thus, the mere fact that Sleash has an independent duty to maintain certain quality standards in order to avoid abandoning its mark, *see FreecycleSunnyvale*, 626 F.3d at 515, does not establish trademark infringement. As a result, the resolution of Sleash's trademark infringement argument turns on whether the specific grant clause in the License Agreement conditioned OPP's use of the Slinger® and Sleash® marks on Sleash's "joint" approval pursuant to Section 5.4.

### c. Grant Clause of the License Agreement

The parties disagree about which portion of Section 2.2 functions as the grant clause of the License Agreement. Sleash argues that the grant clause of the License Agreement consists of the following from Section 2.2: "Licensed Marks on or in connection with the manufacture, marketing, promotion, sale and distribution of Licensed Products . . . that are offered for sale or sold by Licensee *in accordance with the terms of this Agreement*." (emphasis added). Sleash adds that because Section 2.2 pertains to "Licensed Products that are offered for sale or sold by Licensee in accordance with the terms of this Agreement" and because 5.4 requires the parties to "jointly approve the materials to be used in manufacturing the Licensed Products," OPP's sale of any unapproved products is outside the scope of the License Agreement.

OPP responds that the grant clause in the License Agreement is properly stated in the first full sentence of Section 2.2, which provides: "Licensor hereby grants to Licensee an exclusive, sublicensable, irrevocable worldwide license to use the Licensed Marks on or in connection with the manufacture, marketing, promotion, sale and distribution of Licensed Products during the Term."

In short, Sleash argues that the License Agreement contains a grant clause that conditions OPP's use of the Licensed Marks on OPP's full compliance with all portions of the License Agreement. In contrast, OPP argues that the "grant" clause of the License Agreement constitutes

the one sentence that explicitly uses the word "grant." The text that Sleash contends constitutes

the grant clause is italicized below and the text that OPP contends constitutes the grant clause is

underlined below.

> Licensor hereby grants to Licensee an exclusive, sublicensable,
> irrevocable worldwide license to use *the Licensed Marks on or in*
> *connection with the manufacture, marketing, promotion, sale and*
> *distribution of Licensed Products* during the Term. . . .
> Specifically, Licensee agrees to maintain commercially reasonable
> quality standards as shall be prescribed by Licensor in writing or as
> otherwise reasonable under the circumstances in the conduct of the
> business operations with which the Licensed Marks are used.
> Expressly under this license, Licensee shall use the Licensed
> Marks only in conjunction with Licensed Products *that are offered*
> *for sale or sold by Licensee in accordance with the terms of this*
> *Agreement*. The Licensee hereunder expressly conveys no
> ownership interest in the Licensed Marks, which shall at all times
> under this Agreement be retained by Licensor.

The resolution of this issue hinges on interpreting the text cited by the parties pursuant to

principles of contract interpretation under Oregon law. *See Miller*, 454 F.3d at 989. In the

parlance of contract law, terms that limit the scope or grant in an agreement serve as

"conditions" to the agreement, the breach of which constitutes infringement. *MDY Indus.*, 629

F.3d at 939. All other terms in a license agreement are "'covenants,' the breach of which is

actionable only under contract law." *Id.* A covenant is a contractual promise, *i.e.*, the

"manifestation of intention to act or refrain from acting in a specified way, so made as to justify

a promise in understanding that a commitment has been made." Restatement (Second) of

Contracts § 2; 13 *Williston on Contracts* § 38:14 (4th ed. 2014); *MDY Indus.*, 629 F.3d at 939.

"No special form of words is necessary to create a promise." *Champion v. Hammer*, 178 Or. 595,

602 (1946); *see* 13 *Williston on Contracts* § 38:14. Instead, a court determines from "a fair

interpretation of the language of the instrument" whether the parties intended a promise.

*Champion*, 178 Or. at 602.

In contrast, a condition precedent constitutes "'facts and events, occurring subsequently to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, [and] before the usual judicial remedies are available.'" *Dan Bunn, Inc. v. Brown*, 285 Or. 131, 142-43 (1979) (quoting 3A A. Corbin, *Corbin on Contracts* § 628 p. 16 (1960)); Restatement (Second) of Contracts § 224. The intent of the parties, "to be ascertained from a fair and reasonable construction of the language used in light of all the surrounding circumstances," determines whether a provision in a contract is a condition or a covenant. *Id.* (quoting 5 *Williston on Contracts* § 663 p. 127 (3d ed.)). Examples of provisions that function as conditions include: (1) use of the words "subject to," which "clearly indicate[s] an intent to impose a condition precedent which, unless satisfied, would prevent specific performance of the contract"'; and (2) "(t)his agreement is subject to * * * obtaining a satisfactory report for subdivision purposes," which "clearly indicate[s] an intent to impose a condition precedent which, not having been satisfied, prevented specific performance of [the] contract." *Dan Bunn*, 285 Or. at 143.[3]

"Although promises and conditions are different, the distinction can be blurred, and the determination whether a provision states a promise, a condition, or both, can be difficult." *Phoenix-Talent Sch. Dist. #4 v. Hamilton*, 229 Or. App. 67, 73-74 (2009). Given this difficulty, the Oregon Court of Appeals noted that the following analysis is helpful:

> (1) a promise is always made by one of the parties to the contract whereas an event can be made to operate as a condition only when the parties to the contract agree that it shall operate as such, except in those cases where conditions are created by law; (2) the purpose

---

[3] "Notwithstanding the fact that no particular words are necessary to create a condition, the words 'if' or 'provided,' as well as the phrases 'provided that,' 'on condition that,' 'in the event that,' and other words that purport to condition performance on another act or event, usually connote an intent for a condition rather than a promise." 13 *Williston on Contracts* § 38:16.

> of a promise is to create a duty in the promisor, whereas the purpose of a condition is to postpone a duty in the promisor; (3) when a promise is performed, the duty is discharged; but where a condition occurs, the quiescent duty is activated; and (4) when a promise is not performed, a breach of contract occurs and the promisee is entitled to damages.

*Id.* at 74 n.1 (quoting John Edward Murray, Jr., *Murray on Contracts* § 135 p. 274-75 (2d ed. 1974)).

A court "will not imply that a covenant is a condition," *Standard Oil Co. of Cal. v. Perkins*, 347 F.2d 379, 383 (9th Cir. 1965), unless the parties use "clear and unambiguous language." *O'Connor v. Zeldin*, 118 Or. App. 620, 623 (1993). This canon of construction avoids "the harsh effect of forfeiture which may result from a failure of a condition precedent, and does not result in a minor failure to perform exactly as called for, wholly destroying all rights under the contract." 13 *Williston on Contracts* § 38:13 (footnote omitted). Another reason contract conditions are generally disfavored is that promises "set the parties' liability from the outset— and conditions therefore will not be found unless there is unambiguous language indicating that the parties intended to create a conditional obligation." *Id.*

Sleash's central argument regarding the scope of the License Agreement relies on the district court's resolution of the dispute in *Sun Microsystems, Inc. v. Microsoft Corp.* In that case, the district court initially granted a preliminary injunction on the plaintiff's claims of trademark infringement, copyright infringement, and unfair competition. *Sun Microsystems, Inc. v. Microsoft Corp. (Sun I)*, 999 F. Supp. 1301, 1311-12 (N.D. Cal. 1998). On appeal, the Ninth Circuit reviewed the district court's ruling on the plaintiff's copyright and unfair competition claims. *Sun Microsystems, Inc. v. Microsoft Corp. (Sun II)*, 188 F.3d 1115, 1117-18 (9th Cir. 1999). The Ninth Circuit vacated the district court's decision to grant a preliminary injunction on the plaintiff's copyright infringement claim because the district court failed to

determine whether the relevant license agreement used covenants or conditions. *Id.* at 1122-23. The Ninth Circuit remanded the case so the district court could determine whether the disputed license agreement included "a limit on the scope of the license rather than independent contractual covenants." *Id.* at 1117.

On remand, the district court concluded that the compatibility provisions in the copyright license agreement were "separate covenants rather than limitations on the scope of the licenses." *Sun Microsystems, Inc. v. Microsoft Corp. (Sun III)*, 81 F. Supp. 2d 1026, 1032 (N.D. Cal. 2000). The district court's reasoning was based in large part on a comparison of the compatibility obligations set forth in the copyright license agreement with the parties' separately negotiated trademark license (which was not at issue on appeal). The trademark license provided: "Grant of License . . . SUN grants to Licensee a non-exclusive, non-transferable, personal, license to use the Compatibility Logo ("License") . . . with respect to each of the Products that fully meet the certification requirements of Section 3." *Id.* (alteration in original). In contrast to that provision, the court found that the grant in the license agreement "sa[id] nothing about the license grants being subject to, conditional on, or limited by compliance with the compatibility obligations set forth" in the license agreement. *Id.*

As previously discussed, Sleash argues the following operates as the grant clause of the License Agreement: "Licensed Marks on or in connection with the manufacture, marketing, promotion, sale and distribution of Licensed Products . . . that are offered for sale or sold by Licensee in accordance with the terms of this Agreement." The quoted text provided by Sleash, compared to *Sun III*, might lead one to conclude that this case is factually analogous. There are several important differences, however, that distinguish the License Agreement from the agreement at issue in *Sun III*.

First, the text identified by Sleash as the grant clause jumbles together different portions of Section 2.2 of the License Agreement. By selectively editing this provision, Sleash creates an unnatural reading of the License Agreement. No full sentence within Section 2.2 of the License Agreement uses the term "grant" and explicitly conditions OPP's rights on the satisfaction of particular sections of the License Agreement. Notably, the last portion of what Sleash contends is the grant clause, which purportedly conditions OPP's rights on the satisfaction of every other provision in the License Agreement, is taken out of context. The relevant full sentence reads: "Expressly under this license, Licensee shall use the Licensed Marks only in conjunction with Licensed Products that are offered for sale or sold by Licensee in accordance with the terms of this Agreement." The most natural and reasonable reading of this text is that OPP may only use the Licensed Marks on Licensed Products, which both parties concede OPP did in this case. Moreover, this sentence uses text indicating a promise and not a condition. As explained above, a condition requires a fact or event to occur before there is a right to performance, *see Dan Bunn*, 285 Or. at 142-43, whereas all other terms are considered covenants (*i.e.*, an "intention to act or refrain from acting in a specified way"). *See MDY Indus.*, 629 F.3d at 939; Restatement (Second) of Contracts § 2. OPP's use of the Licensed Marks is not conditioned on any particular fact or event and, instead, OPP is simply *promising* not to use the Licensed Marks on anything other than Licensed Products as defined by the License Agreement. Thus, the Court finds that this particular sentence within Section 2.2 functions as a promise that OPP will only use the Licensed Marks on Licensed Products as defined in Section 1.6 of the License Agreement.[4]

---

[4] Section 1.6 of the License Agreement defines "Licensed Product" to mean: "any pet product or device, or any product intended for use with or relating to pets, that incorporates any of the Licensed Technology, which Licensee may market and sell under one or more brand names, including the Licensed Marks."

Second, and unlike the trademark license analyzed in *Sun III*, the limiting clause cited by Sleash does not expressly reference Section 5.4. Sleash argues that grant clause in the License Agreement is conditioned on OPP's compliance with Section 5.4 of the License Agreement which governs the "Input on Materials" and provides that the parties "jointly approve the materials to be used in manufacturing the Licensed Products." Nowhere in Section 2.2, however, is Section 5.4 referenced—this distinguishes the trademark license in *Sun III* that explicitly referenced compliance with another portion of that license agreement.

Third, Sleash's argument is further undermined when considered in light of the surrounding context. A sentence in the middle of Section 2.2 and not cited by Sleash explicitly references quality standards. That sentence reads: "Specifically, Licensee *agrees to maintain* commercially reasonable quality standards as shall be prescribed by Licensor in writing or as otherwise reasonable under the circumstances in the conduct of the business operations with which the Licensed Marks are used." (emphasis added). The phrase "agrees to maintain" constitutes a promise and does not condition OPP's use of the Licensed Marks on Sleash's prior approval. It would be peculiar to read the text cited by Sleash as creating a condition regarding the quality of materials that OPP must use without considering the preceding sentence that explicitly addresses issues of quality standards.[5]

The words and context of Section 2.2 thus demonstrate that the text cited by Sleash as "conditional" is an unambiguous reference to specific covenants, or promises, and not a condition. *See Williams*, 351 Or. at 379. Even if the Court were to find that Sleash's alternative interpretation creates an ambiguity, the Court's conclusion is supported by the mutual and

_____

[5] Sleash did not present the Court with evidence that it provided OPP with written notification of commercially reasonable quality standards at any time during the parties' performance under the License Agreement.

common intention of the parties as evidenced beyond the four corners of the License Agreement. *See Yogman*, 325 Or. at 363. The parties did not present evidence from the day the License Agreement was signed on December 28, 2012 regarding specific materials that must be used in the disc and plush toys, or any schedule for production that conditioned the sale of Sleash Pet Specialty Products on the joint approval clause from Section 5.4. Indeed, the drafting history of Section 2.2 indicates that the parties removed terms, such as "but always the quality of the Licensed Products shall be satisfactory to Licensor," and instead simply allowed Sleash to prescribe in writing "commercially reasonable standards." This "parol evidence is admissible to explain the circumstances under which" the contract was made. *See Deerfield Commodities, Ltd. v. Nerco, Inc.*, 72 Or. App. 305, 317 (1985).

Sleash also submitted evidence that it provided OPP with a detailed list of the types of materials to be used in the Sleash Pet Specialty Products in October 2012. Twain and Buescher explained that the products used by Sleash were not economically viable and that OPP represented to Sleash that it would take the Sleash Pet Specialty Products, produce them in an economically viable manner overseas in China, and that the original list of materials provided by Sleash to OPP was merely an aid in that endeavor. This understanding of the original material list is corroborated by the fact that the improved ball toy and Arm System produced by OPP used different materials from that originally used and described by Sleash.

The parties' course of dealing and performance under the License Agreement also indicate that Sleash did not object to the sale of products that were not "jointly approved" with regard to the Arm System and ball toy. Instead, the parties used an iterative and interactive process, whereby OPP would send products to Sleash in accordance with the informal production schedule set by the parties. OPP testified at the hearing, and Buescher confirmed, that Sleash

PAGE 32 – OPINION AND ORDER

wanted to get the Sleash® and Slinger® products promptly into production in order to collect the royalties contemplated under the License Agreement. Given this context, the "joint approval" process does not appear to be an independent condition to performance under the License Agreement. At most, Section 5.4 was treated as a covenant that governed how the parties would work together. Because the joint approval requirement in Section 5.4 was treated as a covenant, rather than a condition, OPP's sale of the disc and plush toys without Sleash's prior "joint approval" would constitute, at most, a breach of contract.

The lack of support for Sleash's proposed construction of Section 2.2 leads the Court to find that the text cited by Sleash does not use "clear and unambiguous language" that creates a condition. *See O'Connor*, 118 Or. App. at 623. In sum, the Court is not convinced that Sleash is likely to succeed on the merits under its alternative theory. Because OPP was likely operating within the scope of the License Agreement, Sleash's claim constitutes one for breach of contract and not trademark infringement. If Sleash intends to terminate the License Agreement because of an alleged breach pursuant to Section 10.3(b), Sleash must first provide the notice that is required under Section 20.

**B. Serious Questions on the Merits and Balance of Equities**

The Ninth Circuit has held that a "'preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor.'" *Alliance*, 632 F.3d at 1134-35 (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)). In light of the Court's conclusion that Sleash's trademark infringement claim is unlikely to succeed on the merits based either on a theory based on the termination of the License Agreement or a theory that OPP operated outside the scope of the License Agreement, the Court also concludes that Sleash has not raised serious questions with respect to the merits of its claim.

PAGE 33 – OPINION AND ORDER

Sleash also failed to establish how the "balance of hardships tips sharply" in Sleash's favor. Although Sleash argues that it must actively protect the quality of its products under its trademark, the Court notes that Sleash can still enforce those rights pursuant to Sections 10.3 and 20 of the License Agreement and that this Court's ruling on the preliminary injunction motion has not addressed whether Sleash provided a naked license to OPP.  Moreover, to the extent that OPP continues to sell products that Sleash finds unacceptable, the Court finds that the conflicting evidence regarding the quality and consumer acceptance of the products does not alone satisfy the balance of hardships test. As a result, the Court declines to grant Sleash's motion for a preliminary injunction.

## CONCLUSION

The Court DENIES Plaintiff's Motion for Preliminary Injunction (Dkt. 4).

**IT IS SO ORDERED**.

DATED this 6th day of August, 2014.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge